## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **VINCENT WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 10 C 7105** |
| | ) | |
| **v.** | ) | **Judge Ronald A. Guzmán** |
| | ) | |
| **CITY OF CHICAGO BOARD OF** | ) | |
| **EDUCATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Vincent Williams brought suit alleging employment discrimination based on his age, race, and sex against the City of Chicago Board of Education ("Board"). The Board moves for summary judgment, which, for the reasons stated below, the Court grants.

**I.      Facts**

This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343; 42 U.S.C. §§ 1988, 2000e-5(f)(3), § 12117. (Pl.'s Resp. Def's. Statement Facts, Dkt. #57, ¶ 3.) Venue is proper because a substantial portion of the acts complained of allegedly occurred in the Northern District of Illinois. (*Id*. ¶ 4.)

Plaintiff Vincent Williams is African American and was born in 1958. (*Id*. ¶ 1.) At the time of the events at issue, he was a day-to-day substitute teacher for the Board. (*Id.* ¶ 5.) A day-to-day substitute teacher is one who is employed on a day-to-day basis to fill temporary vacancies, as needed, throughout the Chicago Public School ("CPS") system. (*Id*. ¶ 6.) Day-to-day substitutes are not guaranteed daily assignments. (*Id*.) In order to receive a substitute assignment, the teacher normally calls the Substitute Center at the Board's Central Office the day before he would like to teach in order to indicate his availability for work. (*Id*. ¶

7.)  On December 7 and December 11, 2009, Plaintiff substitute taught at Pershing West Middle School ("Pershing West"). (*Id*. ¶ 8.)  Cheryl Watkins was the principal of Pershing West during the 2009-2010 school year.  She is African American. (*Id*. ¶ 9.)  Her Assistant Principal was Tamara King, who is also African American. (*Id.*)

At some point on December 7, 2009, while Plaintiff was teaching at Pershing West, King learned that Plaintiff had left the classroom unattended that day more than once.  (*Id*.)  King went to Plaintiff's room to investigate and saw Plaintiff sitting at a desk reading a book or magazine. (*Id*. ¶ 10.)  King told Plaintiff that if there was an emergency and he needed to leave the room, he should call the main office so someone could cover his classroom.  (*Id.* ¶ 11.) Plaintiff then told King that he had left the room because he needed some water. (*Id*.)  Plaintiff admitted both to King and at a subsequent investigatory hearing that he left the room three times during that class period and to reading a book or magazine during instructional time.  (*Id.)*

Four days later, someone from the Board's Substitute Center called Plaintiff indicating that he could teach on December 11, 2009, at one of two schools: Overton or Pershing West. (*Id*. ¶ 14.)  Plaintiff chose Pershing West, and was instructed to substitute teach in an art class. (*Id*. ¶¶ 15-16.)  King told Plaintiff that he needed to pick up the students and take them to art class.  (*Id.)* When it came time for art class, King noticed that Plaintiff had not picked up the students as directed, so she had to check on Plaintiff and instruct him to follow the schedule.[1]  (*Id*.)

After Plaintiff taught the art class, he dropped the students off at the lunch room.  (*Id*. ¶

---

[1]  Plaintiff asserts that he had more responsibilities than just teaching art class and that he did not know that he was supposed to pick up students.  In support, he cites generally to the transcript of the hearing held before the Illinois Educational Labor Relations Board ("IELRB"), but fails to provide a specific cite to the 158-page long transcript.  Accordingly, the Court deems this statement of fact by the Board to be admitted.

17)  He then went to the main office and told King that he wanted to leave early for the day because he felt he was being mistreated but did not want to discuss the matter.[2]  Plaintiff claims that King said, "I am going to have to cancel art because of your f--- ass."  (*Id.* ¶ 17.) Specifically, in the account he wrote of this alleged December 11, 2009, incident later that evening and submitted as part of a December 11, 2009, Grievance Authorization form, Plaintiff admitted he heard only the "f" sound and did not know what "f" word King used.  (*Id.* ¶ 18). Plaintiff notes, however, that in a February addendum to the Grievance Authorization form, he states that King said "fat fag ass."  Moreover, in his Amended Complaint, Plaintiff alleges that King called him a "fat fag ass."  (*Id.* ¶ 19.)  The December 11, 2009 Grievance Authorization form does not mention Plaintiff's age, sex or race.

As noted, Plaintiff attached to the December 11, 2009, Grievance Authorization form a statement several pages long complaining about how he was treated by King at Pershing West. (*Id.* ¶ 20.)   In this statement, Plaintiff admitted that he left students unattended in the classroom on three occasions on December 7, 2009, and that he was reading a book during instructional time.  (*Id.*, Def's Ex. F, at 3-4.)  In December 2009, Plaintiff sent a copy of the Grievance Authorization Form and statement to Cheryl Colston, who is African American and is the director of the Board's Office of Employee Relations.  (*Id.* ¶ 21.)

Watkins, Pershing West's principal, was not in school on the days that Plaintiff substitute taught there.  (*Id.* ¶ 22.)  On December 16, 2009, King sent an email to Watkins to inform her of the events that had taken place at Pershing West with respect to Plaintiff.  (*Id.* ¶ 23.)  King

---

[2]  Although Plaintiff denies that he said this, his citation to "Exhibit B" does not support the denial and the Board's statement with respect to this fact is deemed admitted.

informed Watkins that she had asked the clerk to contact the Substitute Center to request that

Williams not be assigned to substitute teach at Pershing West. (*Id.*) When King sent the

December 16, 2009 email to Watkins, neither she nor Watkins knew that Plaintiff had completed

the Grievance Authorization Form and sent it to Colston. (*Id.* ¶ 24) Plaintiff submitted an

addendum to his Grievance Authorization Form to his union on or about February 12, 2010. (*Id.*

¶ 25, Def's Ex. G.) He attached another statement several pages long to this form. In this

statement, he admitted that he had left students unattended and that he had read a book during

instructional time. (*Id.*)

In the addendum, Plaintiff also asserted for the first time that King was carrying a white

Taser when she visited him in his classroom on December 7, 2009, and displayed it in a

threatening manner. (*Id.* ¶ 26.) Later, in his hearing before the IELRB and at his deposition,

Plaintiff identified the item that King had as a gun. (*Id.*) The only mention that Plaintiff makes

of his protected status in the addendum is that he is a "blackman" setting an example for the

children in the CPS system and that he was the only "blackman" teaching at Pershing West on

December 7 and 11, 2009. (*Id.*) At the hearing, Plaintiff states that he did not report in the

December 12, 2009 Grievance Form that King was purportedly carrying a weapon because he

did not remember it until two months later. (*Id.* ¶ 27.)

On April 23, 2010, Plaintiff's union filed a grievance regarding the December 2009

incidents at Pershing West. (*Id.* ¶ 28.) Watkins held a grievance hearing on May 4, 2010, in her

office at Pershing West at which Watkins, King, Plaintiff, and his union representative were all

present. (*Id.* ¶ 29.) The grievance hearing was the first time that Watkins had met Plaintiff. (*Id.*)

At the hearing, Plaintiff told Watkins and King that while he was waiting for the bus to take him to Pershing West on December 11, 2009, a police van drove up to him and a male voice coming from the van said "She's going to be direct. Don't go." (*Id.* ¶ 30.) Plaintiff interpreted this to mean that King was going to be direct with him. (*Id.*) Plaintiff also told Watkins and King that after he boarded a bus and exited at the stop nearest the school, a man in the same van drove up to Plaintiff, shook his head "no" and pointed in the direction away from the school. (*Id.* ¶ 31.) Plaintiff also stated that he thought it was strange that the doors to Pershing West "just opened" when he approached without his having to ring the bell. (*Id.*) Plaintiff testified in his deposition that he implied at the grievance hearing that King had had the police follow him to Pershing West on December 11, 2009. (*Id.*)

On May 5, 2010, Watkins wrote a letter to the union denying Plaintiff's grievance. (*Id.* ¶ 32.) On May 11, 2012, Watkins e-mailed the Substitute Center in order to make certain that Plaintiff was not sent to Pershing West again and to make sure that the Center was aware of the disturbing statements Plaintiff made during the grievance hearing. (*Id.* ¶ 33.) In that e-mail, Watkins forwarded King's e-mail of December 16, 2009, in which she summarized Plaintiff's poor performance during the two days he had taught there. (*Id.*)

On or about May 11, 2010, Angela Simpson, the head of the Board's Substitute Center, received the e-mail Watkins sent. (*Id.* ¶ 34.) Prior to receiving the e-mail, Simpson had been unaware of the problems with Plaintiff's performance. (*Id.*) Simpson's supervisor instructed her to forward the e-mail to the Board's Office of Labor and Employee Relations for an investigatory conference to determine whether Plaintiff had violated the Board's Employee Discipline Code. (*Id.*) On or about July 15, 2010, Simpson had someone from the Substitute

Center forward the e-mail. (*Id.*) Watkins' concerns were of the type the Substitute Center would routinely forward to the Office of Labor Relations. (*Id.* ¶ 35.) Prior to her referring the complaint about Plaintiff to the Office of Labor and Employee Relations, Simpson was not aware that Plaintiff had filed any grievances. (*Id.* ¶ 36.)

Thomas Krieger, the Assistant Director of the Board's Office of Employee Relations, oversees the Board's disciplinary processes. (*Id.* ¶ 37.) On July 19, 2010, he scheduled an investigatory conference for Plaintiff and certain other substitute teachers who had pending disciplinary issues. (*Id.*) Krieger did not know that Plaintiff had previously filed a grievance authorization form. An investigatory conference was held at the Board on August 6, 2010. (*Id.* ¶ 38.) The allegations of misconduct included Plaintiff's leaving his classroom unattended, reading during instructional time, failing to follow lesson plans and failing to meet students as scheduled during the dates he substitute taught at Pershing West in December 2009. (*Id.*)

A finding that Plaintiff committed any one of the allegations made against him at his investigatory conference would warrant termination of a day-to-day substitute teacher under the Board's Employee Discipline and Due Process policy. (*Id.* ¶ 39.) At the investigatory conference, Plaintiff again admitted to leaving the classroom unattended and to reading during instructional time. (*Id.* ¶ 40.) The hearing officer substantiated all of the allegations against Plaintiff and recommended that he be terminated. (*Id.* ¶ 41.) On August 9, 2010, the Board notified Plaintiff that his employment was terminated. (*Id.* ¶ 42.)

Another African American male, Peter W., was a substitute teacher at Pershing West two times during December 2009 and he worked without incident. (*Id.* ¶ 43.) A principal can only recommend that a day-to-day substitute teacher be removed from the substitute pool (and denied

substitute work). (*Id.* ¶ 44.) The Board, through a recommendation from the Office of Labor and Employee Relations, makes the final determination as to whether the day-to-day substitute is removed. *Id.*

## II.    Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, in order to withstand a motion for summary judgment, the nonmoving party must show that a dispute about a genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The nonmoving party may not merely rest upon the allegations or details in his pleading, but instead, must set forth specific facts showing there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

Before addressing the merits of Plaintiff's claims, the Court notes that the Board provided the notice to pro se litigants prescribed by Local Rule 56.2. Nevertheless, Plaintiff failed to properly respond to the Board's statements of material fact. While Plaintiff denies certain statements of fact, he sometimes fails to cite to the record in support. In other instances, he denies certain statements of fact but cites only generally to various exhibits and attachments without identifying a specific page number. Finally, some of Plaintiff's citations to the record simply do not support the denial. The Court appreciates that Plaintiff is proceeding pro se. Nevertheless, pro se litigants must abide by the same rules as litigants who are represented by counsel. *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (pro se litigants are not "excused from compliance with procedural rules").

Accordingly, to the extent that any of Plaintiff's denials do not contain a citation to the record or the citation does not support the denial, those statements of fact by the Board have been deemed admitted. *See* Local Rule 56.1(b)(3) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *see also United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010) ("At summary judgment ... saying so doesn't make it so; summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact, and it [is] not the district court's job to sift through the record and make [the party's] case for him.").

**III.    Analysis**

Plaintiff alleges age, sex and race discrimination, as well as retaliation and harassment.

**A.    Age, Race and Sex Discrimination**

With respect to the race and sex discrimination claims, "[a] plaintiff seeking relief under Title VII can prove discrimination using the 'direct' method or the indirect, burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Van v. Peters*, No. 08 C 4718, 2010 WL 2609646, at *4 (N.D. Ill. Jun. 24, 2010).

To prove discrimination in violation of the ADEA, Plaintiff must establish that the defendant subjected him to an adverse employment action because of his age. *See Van Antwerp v. City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010). In other words, age must be the but-for causation for the alleged adverse action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 276 (2009). As with the race and sex discrimination claims, Plaintiff may attempt to prove age

discrimination by either the direct or indirect methods of proof.[3]  *Van Antwerp*, 627 F.3d at 297.

      1.    Direct Method

Under the direct method Plaintiff "can meet his burden of proof by offering direct evidence of animus–the so-called 'smoking gun'--or circumstantial evidence which establishes a discriminatory motive on the part of the employer through a longer chain of inferences." *Id.* (citing *Mach v. Will County Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009)).  "The focus of the direct method of proof ... is not whether the evidence offered is itself 'direct' or 'circumstantial' but rather whether the evidence 'points directly' to a discriminatory reason for the employer's action." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 501 (7th Cir. 2010) (citation omitted).

Direct evidence is evidence that would prove discriminatory intent without reliance on inference or presumption. *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 599 (7th Cir. 2003).  Direct evidence is "akin to an admission by an employer." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  Circumstantial evidence is evidence from which a jury might infer intentional discrimination but without a direct admission from the employer. *Id.*  It includes:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the

---

[3]   The Seventh Circuit has noted that "[w]hether [the] burden shifting analysis survives the Supreme Court's declaration in *Gross* in non-Title VII cases, remains to be seen." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 501 (7th Cir. 2010).  Absent a definitive directive to the contrary, the Court assumes that the indirect method may still be used to establish a case of age discrimination under the ADEA.

> employee was qualified for the job in question but was passed over in favor of a
> person outside the protected class and the employer's reason is a pretext for
> discrimination.

*Hemsworth v. Quotesmith.Com., Inc*., 476 F.3d 487, 491 (7th Cir. 2007).

As an initial matter, the Court notes that Plaintiff's sex discrimination claim does not

appear to be based on the fact that he is male, but rather on his sexual orientation.  The Seventh

Circuit has stated, however, that

> . . . Congress intended the term 'sex' [as used in Title VII] to mean 'biological
> male or biological female,' and not one's sexuality or sexual orientation.
> Therefore, harassment based solely upon a person's sexual preference or
> orientation (and not on one's sex) is not an unlawful employment practice under
> Title VII.

*Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1084 *(*7th Cir. 2000) (internal citations omitted).

Thus, the Court grants judgment to the Board with respect to any claim of discrimination based

on sexual orientation.

Even assuming that Plaintiff was alleging that he was discriminated against because he is

male, he fails to offer any direct or circumstantial evidence of discrimination based on his

gender.  The same is true with respect to the age and race discrimination claims.  Therefore,

Plaintiff's age, sex, and race discrimination claims fail under the direct method.

2.    Indirect Method

As noted by the Seventh Circuit,

> [t]o establish a prima facie case of age discrimination under the indirect method,
> [the plaintiff] must prove that (1) he is a member of a protected class (which he is,
> being 40 or older); (2) his performance met the company's legitimate
> expectations; (3) despite his performance he was subject to an adverse
> employment action . . . ;  and (4) the company treated similarly situated
> employees under 40 more favorably. If [the plaintiff] satisfies these criteria, the
> company may provide a legitimate, nondiscriminatory reason for the termination.
> Assuming the company offers as much, [the plaintiff] may challenge the stated

> reason as a pretext for discrimination. Again, however, the ultimate burden to prove intentional discrimination always remains with [the plaintiff].

*Martino v. MCI Commc'n. Servs., Inc.*, 574 F.3d 447, 453 (7th Cir. 2009) (internal citations omitted). This same burden-shifting approach applies to the race and sex (assuming *arguendo* that Plaintiff is claiming he was discriminated against because he is male) discrimination claims. *Phillips v. ITT Educ. Servs., Inc.*, No. 10 C 2441, 2011 WL 4808162, at *4 (N.D. Ill. Oct. 11, 2011).

Plaintiff fails to demonstrate that he was meeting the Board's legitimate expectations given that he admits that he left the classroom unattended on three occasions and that he read a book during instructional time. Moreover, Plaintiff does not point to any record evidence in support of his assertion that similarly situated employees outside the protected class were treated better than he. Therefore, his age, sex and race discrimination claims also fail under the indirect method.

Accordingly, the Court grants summary judgment to the Board with respect to Plaintiff's age, sex, and race discrimination claims.

B.     Retaliation

As with the discrimination claims, Plaintiff may attempt to survive summary judgment with respect to his Title VII retaliation claim under either the direct or indirect methods. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387 (7th Cir. 2007) (citations omitted). Under the direct method, Plaintiff must present evidence of: (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Id.* (citations omitted). Under the indirect method, Plaintiff must show that (1) he engaged in statutorily protected activity; (2) he met his employer's legitimate expectations; (3) he suffered

an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 634-35 (7th Cir. 2009) (citation omitted). Once a plaintiff establishes the prima facie case under the indirect method, the defendant must articulate a nondiscriminatory reason for its action; if it does, the burden remains with the plaintiff to demonstrate that the defendant's reason is pretextual. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007).

According to Plaintiff's amended complaint, his protected activity was submitting the December 12, 2009 Grievance Form and the February 2010 addendum to his union. However, because neither document indicates that the alleged discrimination occurred because of his age, race or sex, it cannot form the basis for protected activity. *Kodl v. Bd. of Educ., Sch. Dist. 45, Villa Park*, 490 F.3d 558, 563 (7th Cir. 2007) ("To constitute protected expression, 'the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class. Merely complaining in general terms of ... harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.'") (citation omitted).

To the extent that Plaintiff's statement in his grievance form that he was the only "blackman" teaching at Pershing West in December 7 and 11, 2009 constitutes protected expression, he has failed to present evidence of causation under the direct method. While Plaintiff asserts that the proximity of his December 2009 grievance to Watkins' May 11, 2010 request Plaintiff not be sent to Pershing West or his August 2010 termination shows retaliation, "[t]he mere fact that one event preceded another does nothing to prove that the first event caused the second." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (citations

12

omitted). "Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Id.* Plaintiff fails to make any such showing and therefore cannot establish that a separation of six months between the grievance and the May 2010 e-mail from Watkins or the nine months between the grievance and his August 2010 termination is sufficient temporal proximity to establish causation. *See Kodl v. Bd. of Educ., Sch. Dist. 45, Villa Park*, 2006 WL 2192014, at *16 (N.D. Ill. Aug. 1, 2006) (finding two-month separation between complaint and transfer insufficient to establish causation), and cases cited therein, *aff'd,* 490 F.3d 558 (7th Cir. 2007); *see also Benuzzi v. Bd. of Educ. of City of Chic.,* 647 F.3d 652, 666 (7th Cir. 2011) ("The two-month time frame separating Benuzzi's first amended EEOC complaint and her second suspension is, without more, insufficient to give rise to ... [an] inference [of retaliation]").

Even if Plaintiff had engaged in protected activity, his retaliation claim still would not succeed under the indirect method because he does not point to evidence demonstrating that he was meeting his employer's legitimate expectations or was treated less favorably than similarly situated employees who did not engage in the protected activity. Thus, Plaintiff's retaliation claim fails under either the direct or indirect methods and the Court grants summary judgment in the Board's favor on this claim.

C.      Harassment

Plaintiff also alleges in his amended complaint that he was "harassed" and "badgered" by King and that the Board failed to stop the harassment. In order to prevail on a hostile work environment claim, Plaintiff must demonstrate that: (1) he was subject to unwelcome harassment; (2) the harassment was based on his age, sex, or race; (3) the harassment

unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being; and (4) there is a basis for employer liability. *Chaney v. Plainfield Healthcare Ctr*., 612 F.3d 908, 912 (7th Cir. 2010) (race); *Roby v. CWI, Inc*., 579 F.3d 779 (7th Cir. 2009) (sex)*; Atanus v. Perry*, 520 F.3d 662, 676 (7th Cir. 2008) (age). Moreover, the harassment must be "'so severe or pervasive as to alter the conditions of employment and create an abusive working environment.'" *Rhodes v. Ill. Dep't of Transp*., 359 F.3d 498, 506 (7th Cir. 2004) (quoting *Hilt-Dyson v. City of Chic.*, 282 F.3d 456, 462–63 (7th Cir. 2002)). Finally, the working environment must be "both subjectively and objectively" abusive. *Whittaker v. N. Ill. Univ*., 424 F.3d 640, 645 (7th Cir. 2005).

Even assuming that King treated Plaintiff condescendingly, was generally disrespectful, confronted Plaintiff in the classroom about the fact that he had left the students unattended, muttered something about Plaintiff's "fat fag ass," said "fuck you" to Plaintiff and showed him a gun in her belt in a threatening manner, Plaintiff wholly fails to establish that any of this conduct was based on his sex, age or race. And, as already noted above, Title VII does not allow Plaintiff to recover for purported harassment based on his sexual orientation. *Spearman,* 231 F.3d at 1084. Accordingly, the Board's motion for summary judgment as to this claim is granted.

    D.    <u>§ 1981 and § 1983</u>

To the extent that Plaintiff intended to allege claims under § 1981 and § 1983, these also fail. First, in order to prevail on a § 1981 or § 1983 claim, Plaintiff must allege and establish that the violation occurred due to an official policy or custom. *Alexander v. City of Milwaukee*, 474 F.3d 437, 448 (7th Cir. 2007) ("Section 1981, like § 1983, also requires a plaintiff to demonstrate

an official policy or custom in order to allow for municipal liability.").  Plaintiff fails to make

such a showing.  Moreover, because Plaintiff's Title VII claims fails, so do his § 1981 and § 1983

claims.  *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 782 (7th Cir. 2006) ("[T]he same standards

governing liability under Title VII apply to section 1981.") (quotation marks and citation

omitted); *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003) ("Our cases make clear that

the same standards for proving intentional discrimination apply to Title VII and § 1983 equal

protection).

## IV.    Conclusion

        For the reasons stated below, Defendant's motion for summary judgment [37-1] is

granted. The clerk is directed to enter a Rule 58 judgment and terminate this case from the court's

docket.

**Date:** July 24, 2012                    _____
                                          **Ronald A. Guzman**
                                          **United States District Judge**